**UNITED STATES of America,**

v.

**Richard P. ADELSON, Defendant.**

**No. S2 05 CR. 325(JSR).**

United States District Court, S.D. New York.

July 20, 2006.

Alexander H. Southwell, Raymond Joseph Lohier, Jr., U.S. Attorney's Office, New York, NY, for United States of America.

*SENTENCE MEMORANDUM*

RAKOFF, District Judge.

This is one of those cases in which calculations under the Sentencing Guidelines lead to a result so patently unreasonable as to require the Court to place greater emphasis on other sentencing factors to derive a sentence that comports with federal law.

Superseding indictment S2 05 Cr. 325(JSR), filed September 28, 2005, charged defendant Richard P. Adelson with one count of securities fraud, eight counts of causing false reports to be filed with the U.S. Securities and Exchange Commission ("S.E.C."), two counts of soliciting proxies through false statements, and one count of conspiring with others to commit such acts. The gist of the indictment was that Adelson, as Chief Operating Officer and, (eventually) President of Impath, Inc.—a public company specializing in cancer diagnosis testing—joined a conspiracy, initially concocted by others, to materially overstate Impath's financial results, thereby artificially inflating the price of its stock.

It was the Government's theory that the conspiracy began in late 1999, that Adelson joined it in 2001, and that it continued until mid-2003. However, on February 16, 2006, following a two-week trial, a jury, while convicting Adelson of conspiracy, securities fraud, and the three of the false filing counts that related to filings made in the latter half of 2002, acquitted him of all seven counts that related to earlier filings.

The most likely reading of the jury's verdict—and one that the Court accepted at sentencing—was that Adelson only joined the conspiracy toward its end. Specifically, the evidence credited by the jury shows that the conspiracy—essentially an accounting fraud—was hatched by various Impath accounting executives and employees who were under strong pressure from the Chief Executive Officer, Anuradha Saad, to maintain the company's healthy financial results and thereby buttress its "high-flying" status in the securities markets. The fraud was sufficiently sophisticated to fool the company's outside auditors, and it also fooled Dr. Saad, from whom the Government, after originally charging her with complicity in the fraud, eventually accepted a plea to misappropri-

ating company funds for personal expenses (a misconduct unearthed, ironically, by Adelson). However, as the jury's split verdict attests, Adelson, who had more financial acumen than Saad, ultimately became aware of the fraud toward its latter stages, but, rather than expose it, chose to conceal it and to participate in its continuation, thus leading to his conviction.

After the fraud was uncovered, the accounting employees who actually designed the fraud entered into cooperation agreements with the Government, in return for which they became eligible for the substantially reduced sentences that they ultimately received. For her misappropriation of funds for personal expenses, Dr. Saad was given a "non-guideline" sentence of 3 months' imprisonment, which the Government did not appeal.

However, at Adelson's sentencing, on May 30, 2006, the Government argued that the Sentencing Guidelines, if properly calculated in Adelson's case, called for a sentence of life imprisonment, cabined only by the maximum of 85 years permitted under the counts of which Adelson was convicted. Short of that, the Government argued, the Court should at least impose a sentence somewhere in the range of 15 to 30 years' imprisonment. Adelson's counsel, by contrast, argued that the proper guideline calculation resulted in a guideline range of 21 to 27 months' imprisonment, and urged that the actual sentence be well below that range. In the end, however, the Court imposed a non-guideline sentence of 42 months imprisonment (i.e., three-and-a-half years), plus restitution in the amount of $50 million, immediate forfeiture of $1.2 million, three years of supervised release to follow imprisonment, and a life-time ban from being an officer or director of a public company. (Adelson also faces additional monetary sanctions in a parallel pro-

ceeding brought against him by the S.E.C.).

At the time of sentence, the Court set forth on the record the multiple reasons for its determinations, and those findings and conclusions were subsequently reduced to writing in the form of the 69–page transcript of the proceedings. *See* transcript, 5/30/06 ("tr."). Accordingly, when the Court prepared and filed the formal Judgment on June 6, 2006, the Court, after checking the boxes on that form that recite that the Court imposed a non-guideline sentence, *see* "Judgment Attachment (Page 3)," and that the reasons for the non-guideline sentence relate to "the nature and circumstances of the offense and the history and characteristics of the defendant pursuant to 18 U.S.C. § 3553(a)(1)," *id.*, responded to the directive to "[e]xplain the facts justifying a sentence outside the advisory guideline system" by simply referring back to the transcript of May 30, 2006. *Id.*

Nine days later, however, on June 15, 2006, the Second Circuit Court of Appeals issued its decision in *United States v. Rattoballi*, 452 F.3d 127, in which it indicated, albeit in dictum, an intention to strictly enforce the requirement of 18 U.S.C. § 3553(c) that the specific reasons for the imposition of a non-guideline sentence not only must be stated in open court at the time of sentencing, but "must also be stated with specificity in the written order of judgment and commitment . . . ," *id.* at 138. This left in doubt the adequacy of the Court's simple cross-reference to the sentencing transcript in the Judgment. Although the Court of Appeals, in interpreting an analogous provision of Rule 32, Fed.R.Crim.P., had previously suggested that one way to cure such a problem might be simply to append the sentencing transcript to the Judgment, *see United States v. Cortez*, 841 F.2d 456 (2d Cir.1988), *Rattoballi* leaves such a solution arguably in

doubt, and, in any event, given the length of the transcript here, such an approach might not be of much practical value in the instant case.

Accordingly, the Court, *sua sponte*, undertook to draft this Sentence Memorandum, reiterating and further specifying the reasons for the Adelson sentence, with the notion that the memorandum would be appended to the Judgment in compliance with the thrust of *Rattoballi*. Unfortunately, although the first draft of this Sentence Memorandum was prepared on June 23, 2006, the press of other business prevented the Court from completing the final draft until today (July 20, 2006). In the interim, on July 5, 2006, the Government filed a Notice of Appeal from the sentence, thereby arguably depriving the Court of jurisdiction to file this Sentence Memorandum as an attachment to the Judgment now on appeal.

However, Second Circuit case law makes clear that such a memorandum may still be filed by the District Court in "aid of the appeal," *see, e.g., United States v. Deutsch*, 104 Fed.Appx. 202, 203 n. 1 (2d Cir.2004) (summary order); *United States v. Nichols*, 56 F.3d 403, 410–11 (2d Cir.1995); *United States v. Ransom*, 866 F.2d 574, 575–76 (2d Cir.1989) (*per curiam*). Accordingly, the Court will, for now, not attach this Sentence Memorandum to the Judgment, but will simply docket it with the Clerk of the District Court, with direction that it be included in the record on appeal.

Turning then to reasons for the non-guideline sentence of May 30, 2006, as reflected in the transcript of that date:

The Court's first job was to calculate what the sentence would be under the Sentencing Guidelines (using the version of the Guidelines that was in effect when the conspiracy ended in 2003). *See* tr. at 3–32. Since Adelson had had no prior brushes

with the law—indeed, as undisputed evidence submitted by his counsel showed, his life prior to the events here in question was, as the Court concluded, exemplary, tr. at 58–59—his Criminal History Category was "I" (the lowest score possible).

The Government argued, however, that his total Offense Level score was no less than 55. Tr. at 3. This was rather remarkable in itself, for the official Sentencing Guidelines Table—the grid from which guideline sentences are ultimately derived—only lists Offense Levels from 1 to 43. This is because everything above level 42 is "life imprisonment," so there is no need to go higher. Put differently, an Offense Level of 55 is a level normally only seen in cases involving major international narcotics traffickers, Mafia dons, and the like. How could it possibly apply here?

What drove the Government's calculation in this case, more than any other single factor, was the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss. As many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear "objective," tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors. *See generally* Kate Stith & José A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998). Specifically, under § 2B1.1 of the guidelines, a defendant who violates the federal anti-fraud laws starts with a base offense level of either 6 or 7 (depending on the date of the offense), to which is added, *e.g.,* 16 points if the loss is more than $1 million, or 24 points if the loss is more than $50 million, or 28 points if the loss is more than $200 million. United States Sentencing Guidelines ("U.S.S.G.") § 2B1.1(b)(1). Since successful public companies typically issue millions of publicly traded shares—in Impath's case, there were 16.6 million shares of common stock outstanding as of 2003—the precipitous decline in stock price that typically accompanies a revelation of fraud generates a multiplier effect that may lead to guideline offense levels that are, quite literally, off the chart.

The problem is further exacerbated by the fact that the ordinary measure of loss in a criminal securities fraud case is the decline in the price of stock when the fraud is revealed. *See, e.g., United States v. Moskowitz,* 215 F.3d 265 (2d Cir.2000), *rev'd on other grounds, Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Since this occurs at the end of the conspiracy, even someone like Adelson who had no role in originating the conspiracy but only joined it in its latter stages will still be legally responsible under the guidelines for the full loss amount that he could reasonably foresee. *Cf., e.g., United States v. Studley,* 47 F.3d 569, 574 (2d Cir.1995).

In the instant case, the Government calculated that the revelation of accounting irregularities at Impath in press releases issued on July 30, 2003 and August 22, 2003 caused the stock price to decline by 88%, thereby causing Impath's thousands of shareholders to suffer a combined loss of no less than $260 million. Government's Sentencing Memorandum ("Gov.Mem.") at 5. In response, defendant's counsel submitted a report from Dr. Bala Dharan, a distinguished professor of accounting at Rice University, who, after noting that several material accounting irregularities referenced in the July 30 and August 22 press releases were not attributable to the fraud of which Adelson was convicted, concluded that numerous other contemporary marketplace factors also contributed to the

decline in Impath's stock (which, indeed, had been steadily declining since 2001). Because of these "confounding factors," Dr. Dharan opined, it was literally impossible to determine what portion of the actual loss was attributable to the fraudulent conspiracy. Defendant's Sentencing Memorandum ("Def.Mem.") Ex. 1.

Confronted with these two extreme positions, the Court chose to focus, not on actual loss, but on the alternative measure of intended loss, *see* Application Note 3(A) to U.S.S.G. § 2B1.1, which the Court concluded was more than $50 million but less than $100 million, tr. at 26. Although the specifics of the Court's reasoning in this respect were not as fully set forth on the record as they likely now would be in the wake of *Rattoballi,* in essence the Court found that, notwithstanding the substantial decline in Impath stock that occurred before Adelson joined the conspiracy, Adelson would have reasonably foreseen when he joined the conspiracy that the eventual revelation of the overstatement of financial results would still likely cause at least a 20% further decline in the price of the stock. This 20% figure—the Court's rough approximation based on the modest extent of the actual overstatements in the context of the public loss of confidence in Impath's future that had already led to a large decline in share price even before Adelson joined the conspiracy—translates to a loss of around $50 million or so at the time of the July 30 and August 22 press releases that first revealed the accounting irregularities to the marketplace. (The precise calculation is 20%/88% multiplied by $260 million = $59 million). Although Adelson was a johnny-come-lately to the conspiracy, he was still liable for this full $ 50 million-plus loss that he foreseeably understood would likely occur after he joined and furthered the conspiracy, and thus 24 points had to be added to his base offense level of 6, tr. at 25.

At the sentencing hearing, the Government also argued that another 6 points had to be added to the offense level because the offense involved more than 250 victims, U.S.S.G. § 2B1.1(b)(2), that another 4 points had to be added because Adelson was an officer of a publicly-traded company, *id.* § 2B1.1(b)(15)(A)(i), that another 4 points had to be added because Adelson, although not an originator of the fraud, ultimately played a leadership role, *id.* § 3B1.1(a), that another 2 points had to be added because the offense endangered the financial security of a publicly traded company, *id.* § 2B1.1(b)(13)(B)(ii), that another 2 points had to be added because the fraud involved sophisticated means, *id.* § 2B1.1(b)(9)(C), and that another two points had to be added because Adelson had allegedly induced one of the co-conspirators, Peter Torres, to lie to investigators, thereby obstructing justice, *id.* § 3C1.1.

While one might theorize as to why the Sentencing Commission promulgated each of these additions, "the [Sentencing] Commission has never explained the rationale underlying *any* of its identified specific offense characteristics, why it has elected to identify certain characteristics and not others, or the weights it has chosen to assign to each identified characteristic." Stith & Cabranes, *supra,* at 69. Here, their combined effect—an added 20 points under the Government's approach—ill-fits the situation of someone like Adelson. It represents, instead, the kind of "piling-on" of points for which the guidelines have frequently been criticized. *See* tr. at 27–28. Nonetheless, a district court is obligated to add such points where, on a preponderance standard, they are supported by the evidence; and, in the end, the Court found that each of the aforementioned additions except the 2–point adjustment for endangering the financial security of a publicly-traded company and the 2–point

adjustment for obstruction of justice were sufficiently supported by the evidence to require their addition, tr. at 26–30.

Despite these additions, the total offense level of 46 determined by the Court (*i.e.,* a base level of 6, plus a 24 points for loss, plus 16 points for adjustments and enhancements) was 9 points less than the level of 55 recommended by the Government (*i.e.,* a base level of 7, plus 28 points for loss, plus 20 points for adjustments and enhancements). But, under the guidelines, this 20% reduction in the offense level made absolutely no difference in the recommended guideline sentence—for as noted, the guidelines recommend life imprisonment for every offense level over 42. Moreover, as a practical matter, a sentence of life imprisonment was effectively available here, for the statutory maximum sentence for the combined five counts of which Adelson had been convicted was 85 years, which, given his current age of 40, would have led to his imprisonment until the age of 125.

Even the Government blinked at this barbarity. Pressed repeatedly by the Court as to whether he was asking for a guideline sentence (which, under the Justice Department's prevailing policy he was obligated to do), Government counsel refused to answer the question directly, *see, e.g.,* tr. at 4, 46. For example, the following colloquy occurred:

THE COURT: Anything above 43 is lifetime in prison.

THE GOVERNMENT: Yes, your Honor.

THE COURT: And then presumably, then, it's your position, since you take the position that the sentencing guidelines are presumptively reasonable, that I should sentence the defendant to as close to lifetime imprisonment as I can, which would be 85 years.

THE GOVERNMENT: Well, your Honor, our position is a sentence that's consistent with the sentencing guidelines—

THE COURT: Well, the guidelines say life.

THE GOVERNMENT: Right.

THE COURT: So what else could be consistent with that, other than life? Presumably 85 years would do that trick, so whereas two or three or four or five years would not, right?

THE GOVERNMENT: Yes, your Honor, but—

THE COURT: So you want Mr. Adelson to spend the rest of his life in prison. That's your position, yes?

THE GOVERNMENT: Your Honor, I think our position is slightly more nuanced than that.

THE COURT: That would be a welcome change.

THE GOVERNMENT: That we respectfully submit that a sentence that is consistent with the terms of the applicable guidelines—

THE COURT: The applicable guidelines in your view is life imprisonment. What could be consistent with that other than life imprisonment?

THE GOVERNMENT: And consistent with other sentences in other similar cases. We think that by coupling those two together, that would be an appropriate reasonable—

THE COURT: So you think I should impose a non-guideline sentence?

THE GOVERNMENT: Your Honor, as the Court is well aware, our policy is that the guidelines sentence is—

THE COURT: I don't think you can have it both ways. I think you either have to take this position that you seem to be taking in your papers, that this defendant should be sentenced to life imprisonment, or not. I don't think you

can wiggle out of that with this what you call "nuanced" equivocation.

THE GOVERNMENT: Well, your Honor, I think that the guidelines set forth a series of different aggravating factors that are applicable here and that lead to an end result which is something that Congress has determined should be appropriate or as a severe sentence for these type of corporate fraud offenses, and I think that in light of other similarly situated cases and the sentences imposed there, taking into account all of the factors that your Honor should look at all of the factors under 3553(a).

Tr. at 3–5.

On any fair reading of this and similar colloquies throughout the sentencing hearing, it is patent that the Government was asking the Court not to impose a guideline sentence or, indeed, a sentence of anything like 85 years. What this exposed, more broadly, was the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense.

The Government was therefore right to ultimately suggest, as indicated above, that the Court fashion a sentence that, while taking some account of the guidelines, focuses more on the statutory factors set forth in 18 U.S.C. § 3553(a). *United States v. Booker*, 543 U.S. 220, 259, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). Although the Government also argued that the Court should fashion a sentence "consistent with other sentences in other similar cases," specifically citing in its papers to the 25 years given Bernard Ebbers, the 15 and 20 years given John and Timothy Rigas, the 30 years given Patrick Bennet, and the 20 years given Steven Hoffenberg, Gov. Mem. at 31–36, neither in its written submissions nor in its oral argument did the Government attempt to show any de-

tailed similarities between the particular facts pertaining to those defendants and to Adelson. *See id.* Nor is any such comparison justified. Indeed, this Court, which presided over the S.E.C.'s case against WorldCom, *S.E.C. v. WorldCom*, 02 Civ 4963(JSR), is specifically aware of how hugely different that case, involving the largest fraud in history (with losses of anywhere from $2 billion to $11 billion) is from this case, let alone how totally removed the situation of Adelson (a belated entrant to the Impath conspiracy) is from that of Ebbers (an active leader of the WorldCom conspiracy through many of its most critical phases).

Thus, Adelson's counsel was far more on point in reminding the Court that the only other defendant involved in Impath misconduct who had been sentenced at the time of Adelson's sentence, Dr. Saad, had received a three-month sentence, from which the Government had sought no appeal. Def. Mem. at 9–10. But here again, the analogy was far from perfect, for even though the Government had originally charged Saad with participation in the fraud, and never backed off its belief that she had participated in it, the Government conceded that it could not prove this beyond a reasonable doubt and permitted her to plead to a much lesser charge.

In the end, the Court, confronted with an absurd guideline result that not even the Government seriously defended, and with inapt analogies to other cases and defendants, chose to focus its primary attention on the non-guidelines factors set forth in § 3553(a), including both those of general applicability and those that had special relevance to Adelson's particular circumstances.

As the Court noted at the time of sentence, *see* tr. at 32, section 3553(a), entitled "Factors to be considered in imposing a sentence," gives first position to "(1) the

nature and circumstances of the offense and the history and characteristics of the defendant." The offense here was egregious: an accounting fraud extending over several years that had an intended loss of more than $50 million. But, as the Government conceded, Adelson was not the originator of the fraud, and, as the jury found in effect, Adelson did not participate in the fraudulent conspiracy until its final months. During the time of his participation, the price of Impath's stock was not further inflated. *See* Gov. Mem. 1–2; Def. Mem. Ex. 1. On the contrary, after having declined from a high of $81 per share in early November 2000 to $18 per share in June 2002 (the earliest date that, based on the jury's verdict, it is likely Adelson joined the conspiracy), the price remained at $18 per share or lower until the issuance of the press releases in July and August 2004.

Put another way, the evidence showed that Adelson was sucked into the fraud not because he sought to inflate the company's earnings, but because, as President of the company, he feared the effects of exposing what he had belatedly learned was the substantial fraud perpetrated by others. While his efforts in this regard, which included signing certain false filings with the S.E.C., qualified him as a "leader" in guidelines argot, the reality of his situation was that of an executive who, upon learning of his subordinates' misconduct at a time when, for other reasons, the company is already losing shareholder confidence, makes the improper decision to conceal what has occurred. In this sense, Adelson was closer (though not identical) to an accessory after the fact, a position that has historically been viewed as deserving lesser punishment than that accorded the instigators of the wrongdoing.

As for "the history and characteristics of the defendant," it was undisputed at the time of sentencing that Adelson's past history was exemplary. Over 100 persons from all walks of life submitted detailed letters attesting, from personal knowledge, to Adelson's good works and deep humanity. Several letter writers described Adelson's "generosity of spirit," his ever-present willingness to go above and beyond the call of duty to help others. Def. Mem. at 15. As one friend recounted, Adelson would "speak to [another friend who was suffering from mental illness] on the phone at all hours and drive 3 to 4 hours at a moment's notice to care for him." *Id.* Others described Adelson as "in the short category of people who we know we can rely on to be there for us no matter what we might need." *Id.* at 14. These letters from friends and family also detail numerous acts of compassion and generosity that date back to the defendant's childhood and have continued to the present. Not only friends, but also prominent business colleagues (such as the chairman of a large public company), educators (such as a Harvard dean), lawyers, doctors, accountants, health care specialists, clergymen, policemen, and other people whose lives were touched by Adelson's acts of kindness, wrote to the Court to express their admiration for the defendant's integrity and generosity. *Id.* at 17. Numerous colleagues at Impath who personally suffered from the fraud here perpetrated nevertheless also wrote the Court on Adelson's behalf, describing the defendant's commitment to Impath and to its mission to improve the lives of cancer patients. *Id.* at 18.

As these examples attest, Adelson's good deeds were not performed to gain status or enhance his image. Most of them were unknown to all but a few people until the time of his sentencing. But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the

moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

Subsection 2 of section 3553(a) then calls upon the Court to take account of some of the broad general purposes of sentencing, specifically, "the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner." At the time of sentence, neither party remotely suggested that either "C" (more commonly called "specific deterrence") or "D" (more commonly called "rehabilitation") had any relevance to Adelson. With his reputation ruined by his conviction, it was extremely unlikely that he would ever involve himself in future misconduct. Just to be sure, however, the Court, as part of the sentence here imposed, barred Adelson from ever again serving as an officer or director of a public company. Tr. at 62–63.

As for "A" and "B", more commonly referred to as "retribution" and "general deterrence," the Court had no doubt that Adelson's misconduct called for serious punitive measures. In the case of financial fraud, however, an important kind of retribution may be achieved through the imposition of financial burdens. Accordingly, the Court imposed on Adelson a restitution requirement of no less than $50 million, the first $1.2 million of which was obtained by the Court's ordering the immediate forfeiture of most of Adelson's current assets. Tr. at 63. The rest, the Court ordered, must be paid at the rate of 15% of Adelson's monthly gross income following his release from prison, tr. at 60–61, a requirement that virtually guarantees that Adelson will be making substantial restitution payments for the rest of his life. So far as monetary sanctions are concerned, therefore, the Court did indeed impose a life sentence.

As for prison time, the Court concluded that, notwithstanding all the mitigating factors outlined above, meaningful prison time was necessary to achieve retribution and general deterrence. But as to the latter, there is a considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective "white collar" offenders. *See, e.g.,* Richard Frase, *Punishment Purposes,* 58 Stanford L.Rev. 67, 80 (2005); Elizabeth Szockyj, *Imprisoning White Collar Criminals?,* 23 S. Ill. U. L.J. 485, 492 (1998). *Cf.* United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing* 56 (2004) (noting that the Sentencing Guidelines were written, in part, to "ensure a *short but definite* period of confinement for a larger proportion of these 'white collar' cases, both to ensure proportionate punishment and to achieve deterrence") (emphasis supplied); transcript of sentence, *U.S. v. Saad,* 1/17/06, at 33 (similar remarks of Government prosecutor at time of Dr. Saad's sentence).

Not that the three-and-a-half years imposed by the Court is a short sentence in any practical sense. It is, for example, many times the sentence imposed on Dr. Saad, on the other co-conspirators, and on such high visibility "white collar" offenders as Martha Stewart. Moreover, the Government at no time here presented any

evidence or cited to any studies indicating that a sentence of more than three-and-a-half years was necessary to achieve the retributive and general deterrence objectives applicable to a case like this one. And "necessary" is the operative word, for section 3553(a) expressly dictates that "[t]he court shall impose a sentence sufficient, *but not greater than necessary,* to comply with the purposes set forth in paragraph (2) of this subsection" (emphasis supplied). Accordingly, the Court was convinced that three-and-a-half years of prison time was all that was necessary to achieve the purposes set forth in § 3553(a)(2).

The remainder of section 3553(a) is largely concerned with making certain that the sentencing court take account of the guidelines, *see* § 3553(a)(4), and of "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," § 3553(a)(5). As already indicated, the Court here considered the guidelines at length, but, like the Government itself, found them wildly off-base in this case. As for the need to avoid unwarranted disparities, the Court rejected both the Government's claim that Adelson's conduct was comparable to that of Ebbers' and the like, as well as defendant's claim that Adelson's conduct was only slightly more egregious than that of Dr. Saad. But, between these extremes, the sentence the Court did impose was, the Court believes, not unlike sentences that other district courts have imposed in cases involving persons like Mr. Adelson who are belated entrants to substantial financial conspiracies.

Lastly, section 3553(a)(7) reminds the district court of "the need to provide restitution to any victims of the offense." Here, as noted, the Court imposed a restitution requirement of the full $50 million in estimated loss. Tr. at 60. The Court recognized, of course, that it was unlikely that Adelson, once released from prison, with his reputation destroyed and his employment limited to non-public companies, would ever be positioned to make full restitution. *Id.* at 60–61. But, by requiring him to make monthly payments of 15% of his gross monthly income, the Court believes that the maximum restitution realistically obtainable from this defendant will in fact be obtained.

To put this matter in broad perspective, it is obvious that sentencing is the most sensitive, and difficult, task that any judge is called upon to undertake. Where the Sentencing Guidelines provide reasonable guidance, they are of considerable help to any judge in fashioning a sentence that is fair, just, and reasonable. But where, as here, the calculations under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences. This the Court has endeavored to do, as reflected in the statements of its reasons set forth at the time of the sentencing and now in this Sentence Memorandum prompted by the dictates of *Rattoballi.* Whether those reasons are reasonable will be for others to judge.

SO ORDERED.