UNITED STATES of America

v.

Hayim REGENSBERG, Defendant.

No. S1 08 Cr. 219 (VM).

United States District Court,
S.D. New York.

June 29, 2009.

David Mark Siegal, U.S. Attorney's Office, S.D.N.Y., New York, NY, for United States of America.

Michael Sangyun Kim, Kobre & Kim LLP, New York, NY, for Defendant.

## DECISION AND ORDER

VICTOR MARRERO, District Judge.

On April 3, 2009, Defendant Hayim Regensberg ("Regensberg") was convicted of two counts of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, and five counts of wire fraud in violation of 18

U.S.C. § 1343. *Prior to sentencing,* Regensberg moved:

(1) that the Court recalculate the United States Sentencing Guidelines enhancements recommended by the Probation Office with respect to (a) the two-level enhancement recommended when an offense involved sophisticated means, pursuant to U.S.S.G. § 2B1.1(b)(9)(c); and (b) the four-level enhancement recommended when an offense involved a violation of securities law and the defendant was an "investment advisor," pursuant to U.S.S.G. § 2B1.1(b)(16);

(2) that the Court grant his request for a downward departure pursuant to U.S.S.G. § 5K2.13 on the grounds that he committed the offenses while suffering from a significantly reduced mental capacity, specifically, a pathological gambling disorder; and

(3) that, in weighing the factors listed in 18 U.S.C. 3553(a), the Court favorably consider: his physical and mental condition, his family responsibilities, his history of charitable work, and the sentences imposed upon defendants in similar circumstances. *See United States v. Adelson,* 441 F.Supp.2d 506 (S.D.N.Y.2006).

At Regensberg's sentencing before the Court on June 19, 2009, as further elaborated upon in the Statement of the Court which is attached hereto and incorporated herein, the Court found that, in calculating Regensberg's total offense level, the Probation Office properly imposed a two-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(9)(c). However, the Court found that the Probation Office should not have imposed a four-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(16) because Regensberg was not an "investment advisor." In addition, the Court denied Regensberg's motion for a downward departure pursuant to U.S.S.G. § 5K2.13, although the Court considered Regensberg's submissions in support of a pathological gambling disorder in its consideration of the factors under 18 U.S.C. § 3553(a)(1).

The Court concluded that, under the United States Sentencing Guidelines, Regensberg's total adjusted offense level for the seven Counts on which he was found guilty is thirty-one (31) and his criminal history category is I. The Court sentenced Regensberg to a term of incarceration of one hundred (100) months on each of the seven counts, to run concurrently, upon consideration of the factors listed in 18 U.S.C. § 3553(a).

**SO ORDERED.**

ATTACHMENT

*UNITED STATES OF AMERICA V. HAYIM REGENSBERG*

**08 CR. 219**

**STATEMENT BY THE COURT REGARDING DEFENDANT'S SENTENCE**

**JUNE 19, 2009**

**VICTOR MARRERO, UNITED STATES DISTRICT JUDGE.**

In seeking the Court's leniency, Regensberg has made an impassioned case here and in his extensive written submissions that raise several significant issues. The professional thoroughness and diligence evident in counsel's preparation, the strength of advocacy and the level of support expressed for Regensberg by friends, family and business associates, call for a correspondingly detailed explanation of the Court's ruling.

As a point of departure, the Court notes that Regensberg's presentation, though stressing points that argue for uniqueness, distinction and individual consideration, in

fact is not uncommon. The Court has heard much of the argument in echoes from similar pleas for mercy frequently urged in this courthouse, indeed in courtrooms across the country. In particular, Regensberg's argument falls into a pattern advanced by a subset of the white collar criminal. This category encompasses a select class: distinguished, reputable, highly esteemed model citizens such as this defendant. The list of their achievements and virtues is long and impressive. Let us count the ways. At home, they are good family men and women, caring spouses, loving parents, loyal and reliable to friends. At work, they are looked up to as outstanding professionals and business partners. To their community's charities and public causes they are generous patrons and sponsors. And as worshipers they are devout, often rising as leaders of the congregation.

Yet, for all of their outward rectitude, these otherwise good people suffer a fatal flaw: they lead a double life. Somewhere at the core, in a distorted dimension of the soul, the public image they present is as false as the lies they tell to sustain the appearances of an exemplary life. And somehow, for reasons that always defy reason, they fall into crime, doing wrongful deeds that seem aberrational, selfish and greedy acts that, when caught, they claim are entirely out of character with their otherwise law-abiding lives.

Typically, these offenders appear at their sentencing well-represented and well-prepared, offering ample reasons why the Court should exercise exceptional discretion and show maximum leniency. A key aspect of the evidence proffered in mitigation consists of medical records and psychological evaluations attesting that the defendant's criminal conduct, so at odds with an upright character, was driven by some recently diagnosed mental disorder, or ungovernable impulse, or other unknown inner or outer demon he could not conquer that made him do it. An outpouring of sympathy and support from relatives, friends, business colleagues, community leaders, and even some of the victims, accompanies the presentation. The beneficiaries of the defendant's charitable work, in some cases intensified since his arrest, testify about his devotion of good will and donation of resources, underscoring the loss they and the larger community would suffer if deprived of the defendant's invaluable contributions to their public services. And of course, the defendant rises in the courtroom to convey profound, personal apologies for all the sorrow he has caused to all the people with whom he broke faith and hurt and betrayed and shamed.

As it ends, the presentation comes to several conclusions it urges the Court to adopt: that the defendant has already shown full rehabilitation and earned redemption; that there is absolutely no likelihood of recidivism from this defendant and thus no threat of future harm to society; that no further need exists to punish the defendant because he has been wracked long enough by shame, by ruin of his family and personal life, by loss of his primary means to earn a livelihood. The purposes of sentencing thus having been satisfied, ergo: a sentence of any lengthy incarceration would serve little or no useful purpose.

Let me stress at this point that the Court is not unmindful or unsympathetic to these points. There is much in Regensberg's plea to commend the compassion it seeks to evoke. But the argument goes only so far. Compelling as it sounds on the surface, it fails in essential ways. Fundamentally, it is flawed by what it omits. In particular, it makes no account of several other circumstances courts are

instructed to weigh adequately in ordering a fitting sentence: to reflect the severity of the crime; *to promote general respect for the law;* to avoid unwarranted sentencing disparities; and to consider the impact of the crime not only on its immediate victims, but on the larger social order. These principles are interrelated. They share vital links with some basic legal and philosophical concepts, ideals emblematic of the law profoundly significant for sentencing to ensure a right and just result for all concerned: fairness, balance, proportionality, and equality of treatment under law for relatively similar persons and circumstances. In sentencing, these principles seek to ensure that judgments overall fairly align so as to achieve, like planets in orbit, a special form of equilibrium, a proper balance in the delicate symmetry of justice.

In addressing the specific weaknesses in Regensberg's entreaties, I consider more fully several other particular points. First, with regard to the severity of the crime, the common white collar appeal for leniency tends to understate the gravity of the underlying offenses by compressing the defendant's entire record of misconduct as if it were a single, isolated episode of crime, a one-time or sometime thing that occurred over a lifetime of otherwise immaculate behavior. There is a fallacy in this argument. It distorts the record, as illustrated by the case at hand. During the course of over three years covered by the offenses for which he was convicted in this case, Regensberg committed dozens if not hundreds of acts of dishonesty and fraud. He alone devised the illegal scheme and ensnared twenty-three known victims. From each of these twenty-three victims, relatives and friends alike, on multiple, separate occasions over this three-year term he stole large sums of money.

In fact and under law, each of these thefts constitutes a distinct crime for which an offender could be prosecuted by federal or state authorities. So it is misleading, a gross understatement, to assert that Regensberg all along pursued a straight path towards a law-abiding life—except for the inconvenient detours, his deviations hundreds of times in the incidents of thefts and attendant falsehoods he concealed over at least three years.

Second, casting Regensberg as the upright citizen who once went astray overlooks or improperly minimizes perhaps the darkest aspect of his deeds. More aptly viewed, Regensberg's conduct here, as in similar white collar crime cases, summons the image of the wolf in sheep's clothing. It is precisely the defendant's mantle of integrity and benevolence that serves as cover for an invidious end, enabling him to move about his game undetected, the better to prey upon those who least expect it. In other words, it is the widespread recognition in the community that the defendant enjoys for strong character, integrity, sound social values and good public deeds that facilitates his life of crime. The two aspects go hand in hand. The offender's clean outward appearance produces a lulling effect. It allows him to gain access and inspire the unguarded trust and confidence of his victims to make his easiest killings, while also rendering those closest to him—friends, relatives, partners, business associates—his best bets. That the defendant in these cases occupies the same tight circles and mingles freely with his unsuspecting victims, that by virtue of his standing as a man of honor his crimes go undetected longer and he achieves more spectacular success, and that he channels profits from his criminal enterprise, at least in part, to support his charity and further enhance his public image, all make

his conduct that much more sinister and reprehensible.

Recognizing that at any given time the impulses for human conduct are seldom all black or all white, I do not suggest that in all respects the record of benevolence defendants generally point to at sentencing springs entirely from cynical motives. By the same token, stark reality counsels against naivete, and trains the eye to see illusion and call it for charity and further enhance his public image, all make his conduct that much more sinister and reprehensible.

Recognizing that at any given time the impulses for human conduct are seldom all black or all white, I do not suggest that in all respects the record of benevolence defendants generally point to at sentencing springs entirely from cynical motives. By the same token, stark reality counsels against naivete, and trains the eye to see illusion and call it for what it is. This unclouded view suggests to me that, when a defendant commits serious crimes and then begs for leniency under circumstances such as those presented here, and thus uses his good name and good works—again at least to some degree—as both sword and shield, the mask of piety he wears is but the face that previously disarmed his victims, and his front of charity merely the human shield he raises to seek immunity or dramatic mitigation of punishment when he is caught.

In addition, just as the leniency argument tends to falsely portray the offender's crimes as isolated in relation to his life, it also views the underlying misconduct in isolation relative to another reference that cannot be disregarded: the significant number of other offenders similarly situated, those convicted of similar crimes but who were sentenced to a warranted term of imprisonment. To overlook how the Court has sentenced other wrongdoers guilty of the same offenses under sufficiently comparable factual circumstances, is to ignore another vital dimension of justice's symmetry: the principle that sentencing should avoid unwarranted disparities. In this regard, the Court considers the general principle that the sentencing guidelines sought to address the inequities of prior sentencing practices that tended to punish white collar economic crimes less severely than other comparable blue collar offenses. Relevant to this point is that white collar offenders, because of their greater wealth and leadership in the community, enjoy much greater opportunities to participate and rise to prominence in charitable activities, and also possess the means to contribute resources with larger generosity to community service organizations. These social and economic advantages could enable them to gain a substantial edge over blue collar offenders who cannot make claim to comparable means and opportunities with which to mitigate the full impact of a heavy sentence.

In more concrete application of the principles regarding unwarranted disparities, whenever pressed by intense arguments such that Regensberg makes today, the Court regards that compass point for relevant guidance. It asks itself: What if any of the offenders the Court previously sentenced to prison terms for similar crimes under comparable circumstances were in the audience today and listening to this proceeding? If the Court were to grant this defendant his liberty through a sentence of probation or a nominal prison term as the proverbial rap on the knuckles, how would it fairly and persuasively justify the judgment, both to others and to itself, when, for reasons that apply with equal force here, it has repeatedly rejected

similar sentencing appeals from other offenders whose criminal and personal circumstances were similar, or if different, only marginally so? For instance, sitting out there in the public benches right now, if not physically, at least in spirit, the Court senses the presence, weighing upon its judgment like atmospheric pressure, of several other defendants, all otherwise outstanding citizens, who were sentenced here to substantial terms of incarceration for stealing hundreds of thousands of dollars. Just to recall a few, one of them stole from a church, another stole from an agency of the City of New York, a third one looted a hospital.

Regensberg's argument also omits due recognition to the impact of his crimes on all of his victims. Now, the Court recognizes that some of the people who have written to the Court on Regensberg's behalf were victims of his wrongs. But the Court must also consider that these friends in court do not comprise all of the victims, nor are they necessarily typical to the extent some of them have atypical reasons for their support, such as close family ties, or the ability to be forgiving because they can afford to absorb the loss or have already been made whole. No less important a consideration is that the victims of crime are not necessarily just the people who suffer direct losses by reason of an offense. There is a dimension of crime that diminishes the rule of law and the social order as a whole, and that if not properly recognized for what it is when the perpetrator is convicted, disregards the interest of society in effective law enforcement and effective administration of justice.

Finally, the Court notes that preservation of the rule of law and protection of the social order depend integrally upon proper respect for the law. To the degree a sentence either entirely disregards or does not adequately weigh the aspects of sentencing that the defendant's presentation omits, and that the Court here considers, the judgment will not sufficiently align with our collective vision and wisdom of what a right and just sentencing result should reflect, both generally and in this case. Any sentence substantially out of line with that universal view would unduly tip the scale, and not engender proper respect for the law, thus potentially undermining the integrity of the justice system.

With these considerations in mind, the Court now addresses some specific issues that Regensberg's sentencing raises.

■ First, the Court turns its attention to the presentence investigation report ("PSR"). Having reviewed the PSR and the parties' submissions, the Court is persuaded that the Probation Office's recommended sentencing enhancement under United States Sentencing Guideline § 2B1.1(b)(16) is unwarranted. That provision recommends a four-level enhancement when the offense involves securities law and, at the time of the offense, the defendant was an "investment advisor." Under the Investment Advisers Act of 1940, an "investment advisor" is defined as "any person who, for compensation, engages in the business of advising others ... as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." In this case, Regensberg did not receive compensation in return for the business of providing advice to others. Rather, he was to receive a percentage of the profits, if any, that an investor garnered from his or her investment. While Regensberg may have discussed the comparative risks between the Lending product and the IPO product with his victims, there is no indication that he was compensated for such advice. The Court therefore rejects the Probation Of-

fice's recommendation for a four-level enhancement under § 2B1.1(b)(16).

■ Further, the Court is persuaded that a two-level enhancement pursuant to United States Sentencing Guideline § 3B1.3 for abuse of a position of trust is not applicable in this case. This provision states that a two-level enhancement should be imposed "if the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." Application Note 1 of this provision states that a position of "public or private trust" is "characterized by professional or managerial discretion (*i.e.,* substantial discretionary judgment that is ordinarily given considerable deference)." Further, Second Circuit case law is clear that "the defendant's position must involve discretionary authority." *United States v. Hirsch,* 239 F.3d 221, 227 (2d Cir.2001).

The Court is mindful that, as described earlier, Regensberg was able to perpetuate his fraudulent schemes for many years largely because of the nature of the personal relationships that he had with his victims and his standing as a member of authority in his synagogue, where many of his victims also worshipped. However, under both the sentencing guidelines and the law of this Circuit, a personal relationship between the defendant and his victims is not enough to constitute an abuse of a position of trust under § 3B1.3 without an abuse of discretionary authority. *See United States v. Jolly,* 102 F.3d 46, 48 (2d Cir.1996) ("Limiting an enhancement for abuse of trust to the misuse of *discretionary* authority entrusted by the victim or on the victim's behalf is consistent with the examples given in the commentary." (emphasis added)). Here, the testimony from the victims during trial indicated that they did not provide Regensberg with discre-

tion in connection with investing their money. While Regensberg undoubtedly abused the trust of his victims in the conventional sense, the Court is constrained by this Circuit's interpretation of § 3B1.3. Therefore, § 3B1.3 is not applicable in this case.

The Court otherwise adopts the factual recitation in the PSR. Therefore, the Court finds that under the guidelines, Regensberg's offense level amounts to thirty-one (31) and his criminal history falls into category one (I). The recommended range of imprisonment for this offense level and criminal history category is one-hundred and eight (108) to one-hundred and thirty-five (135) months.

Regensberg seeks a downward departure pursuant to United States Sentencing Guideline § 5K2.13 on the grounds that the offenses were committed while Regensberg suffered from a significantly reduced mental capacity. Regensberg has submitted an evaluation from Dr. Sarah Schoen in support of this request.

The Court rejects Regensberg's request for a downward departure under § 5K2.13. Regensberg bears the burden of proving that he suffered from a significantly reduced mental capacity, and the Court is not persuaded, based on Regensberg's submissions, that he has met his burden under § 5K2.13. However, even though the Court rejects a downward departure under § 5K2.13, the Court will consider Regensberg's professed gambling disorder, and Dr. Schoen's submission in support of that diagnosis, in analyzing the factors listed in 18 U.S.C. 3553(a)(1)—in particular, the history and characteristics of the defendant—in arriving at a sentence that is "sufficient but not greater than necessary" to promote the proper objectives of sentencing.

■ Regensberg was found guilty by a jury of two counts of securities fraud and

five counts of wire fraud, which he committed from about 2004 through 2007.

Subsection (a)(1) of 18 U.S.C. 3553 requires that courts take into consideration "the nature and circumstances of the offense and the history and characteristics of the defendant." As I detailed earlier, Regensberg conducted his fraudulent schemes over the course of three years. Most of his victims were not strangers or even acquaintances. Rather, they were close friends who knew him for years, and were members of the same synagogue where he held a position of authority. They relied on their intimate history in trusting him with their money, and Regensberg's abuse of that trust is what enabled him to perpetuate his fraudulent scheme. While Regensberg explains this conduct, in part, as a result of a pathological gambling addiction, such an affliction does not outweigh the egregious nature of his fraud. He did not swindle strangers, but people those closest to him. When asked for documentation to support assurances that he had funds to pay back the investors, he lied and even fabricated a bank record in a desperate effort to hold back his investors from learning the truth.

Subsection (a)(2) of 18 U.S.C 3553 requires that the Court consider the need for the sentence to promote certain objectives of the criminal justice system, namely: punishment, specific and general deterrence, and rehabilitation.

Pursuant to § 3553(a)(6), the Court is also directed to consider the need to avoid sentencing disparities among defendants with similar records and similar offenses in other cases, as well as in connection with the case at hand. The Court has considered Regensberg's citation to *United States v. Adelson*, 441 F.Supp.2d 506 (S.D.N.Y.2006), where Judge Rakoff sentenced a defendant, who was responsible for a loss of over $50 million from more than 250 victims, to 42 months of incarceration. However, not only did the defendant in that case partake in the fraud at the tail end of an ongoing conspiracy organized by co-defendants, but his victims were also strangers. In contrast, Regensberg acted alone, conceiving of and perpetuating the entire scheme from beginning to end. Further, his victims were not faceless stockholders but the closest of friends and associates who relied on that personal history in entrusting him with their money.

Accordingly, weighing all of the considerations set forth in 18 U.S.C. § 3553(a), the Court concludes that a sentence of 100 months on each count, to run concurrently, is sufficient but not greater than necessary to achieve the purposes of sentencing in this case.