In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-3536

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CARL MOOSE,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 15-CR-175-1 — **Charles R. Norgle**, *Judge.*

ARGUED SEPTEMBER 14, 2017 — DECIDED JUNE 27, 2018

WOOD, *Chief Judge*, and RIPPLE and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Without a plea agreement, defendant Carl Moose pleaded guilty to defrauding investors in violation of the federal wire fraud statute, 18 U.S.C. § 1343. The district court gave him a below-guideline sentence of two years in prison and an additional two years of supervised release. Moose has appealed, challenging both his prison sen-

tence and the length and several specific conditions of his supervised release. We affirm the prison sentence and the length of the supervised release term, but remand for the limited purpose of considering several conditions of supervised release. We address in turn Moose's challenges to: (1) the loss amount the district court used in calculating his guideline sentencing range; (2) the fraud guideline's treatment of loss amounts more generally; and (3) the supervised release portion of Moose's sentence, including the duration and conditions of the supervised release sentence.

I.   *Loss Amount*

We review *de novo* the district court's legal interpretations of the Sentencing Guidelines, but we review factual findings as to loss amount for clear error. *United States v. White*, 883 F.3d 983, 986 (7th Cir. 2018). The district court found under U.S.S.G. § 2B1.1(b) (2015) that the applicable loss amount for Moose's offense was about $480,000, which added 12 offense levels to his guideline calculation. Moose argues the correct amount was only about $70,000.[1] If that were correct, six levels would need to be subtracted from the court's calculation of the offense level. See U.S.S.G. § 2B1.1(b)(1) (six-level increase for loss amount of $40,000–$95,000, and twelve-level increase for loss amount of $250,000–$550,000). To explain the issue, we must explain Moose's fraud.

---

[1] In the text we have rounded these and other relevant dollar amounts for narrative clarity. The actual numbers are as follows: Moose collected $680,945 from investors and invested $200,000, keeping $480,945 for himself. Moose argues the loss amount should be $70,445 based on his collection of $680,945 and his claim that shares of stock in California Energy & Power were worth $610,500 in July 2011.

In early 2007, Moose began soliciting investors with a stock tip: a company called California Energy & Power (CEP) was developing vertical-axis wind turbines. He advised investors to act before an investment window closed and CEP began paying its first dividends. Rather than broker sales of CEP stock to the investors, though, Moose formed his own company, Infiniti Wind Technology, to serve as the investment vehicle for purchasing CEP stock. He persuaded his investors to buy shares of Infiniti, which he controlled, by saying that Infiniti would in turn buy shares of CEP.

Moose told investors that he planned to raise $250,000 through Infiniti to purchase four percent of CEP. He said that ownership of Infiniti would be divided into 20 units distributed to individuals based on their investments in that company. He did not tell the investors that he would reserve for himself a portion of the invested funds as either a finder's fee or management fees for Infiniti. In July 2008, Moose surpassed his goal of raising $250,000. Based on his representations to his original investors, Moore should have stopped raising money under the Infiniti name at that point and invested Infiniti's cash in CEP stock.

Moose broke the promises he made to investors in three ways. He continued to raise money from investors in exchange for ownership units of Infiniti after he reached his goal, raising a total of $680,000. He bought only three percent of CEP stock despite a promise to buy four percent. Most important, instead of investing all the $680,000 he received from 16 investors under this investment scheme or even the $250,000 in his statements to investors, Moose invested only $200,000 in CEP. The remaining $480,000 he just took for himself. In July 2011, facing pressure from angry investors, he

stepped down as manager of Infiniti and relinquished his control of the company.

Moose eventually pleaded guilty to one count of wire fraud in violation of 18 U.S.C. § 1343. The district judge determined that the Sentencing Guidelines recommended a prison term of 41 to 51 months. In reaching this figure, the judge concluded that the intended loss resulting from the fraud was $480,000 and the actual loss was $406,000. The judge sentenced Moose to 24 months in prison and 24 months of supervised release.

The Sentencing Guidelines for fraud and similar crimes give substantial weight to the relevant loss amount. See U.S.S.G. § 2B1.1. The relevant amount is the greater of the actual loss or the intended loss. *Id.*, cmt. 3(A). Actual loss is "the reasonably foreseeable pecuniary harm that resulted from the offense," and intended loss is the "pecuniary harm that the defendant purposely sought to inflict." *Id.*

Since Moose invested only $200,000 as promised of the $680,000 he persuaded investors to entrust to him and pocketed the other $480,000, the district court's loss finding of $480,000 is easy to understand. Moose argues, however, that he should have benefited from a guideline feature that calls for a measure of leniency on the loss calculation, at least in limited circumstances. If a defendant returned money or property to a victim before an offense was detected, the value of the returned money or property is deducted from the loss amount. *Id.*, cmt. 3(E)(i). The time of detection is the earlier of either the time of actual discovery or the time when the "defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency." *Id.*

Though Moose admits that he pocketed the $480,000, he argues for a loss figure of just $70,000. To reach that amount, Moose begins with the $680,000 that his victims gave him to invest in CEP. He points out that he initially invested $200,000 of that money before fraud was detected. So far, so good. Moose then muddies the water with internally inconsistent arguments. To qualify for the discount based on returning stolen property before the crime was detected, he contends that he returned this property before the fraud detection in July 2011. His theory is that the investors always had ultimate control over Infiniti through their ownership shares, despite his day-to-day stewardship. Moose reasons, then, that he "returned" the investors' property on the days he purchased the CEP stock in 2007 and 2008. But if that were correct, the property had, at the time of the supposed return, a value of only $200,000, which would not help him avoid the loss amount of $480,000. To maximize the value of that property return, Moose also argues the date he should be deemed to have returned the property to investors should be in July 2011, since that was when he turned over day-to-day control of Infiniti. He argues that at that time the shares of CEP stock were worth about $610,000.

This theory is full of flaws. We first note the very shaky factual support for that $610,000 valuation. As support for that number, Moose points to CEP's stock transfer ledger, which shows that the company issued stock valued at $4.07 per share to two investors in March and May 2011, roughly contemporaneous with the July 2011 detection of his fraud. He then multiplies that per-share value by the 150,000 shares owned by Infiniti to reach $610,000. The government contended, however, that the stock was essentially worthless in July 2011 based on the statement of CEP founder Peter Coye

that the company was out of money by May 2012. Coye also noted that since the company had no revenue and no profits, historically the CEP board itself had determined the value of CEP and that these "valuations were subjective and based on Research and Development." He also described the investment as "highly speculative." A company's internal valuation of its admittedly highly speculative worth does not provide a particularly sound basis for determining the fair market value of its stock. We have no indication that these stock sales at these values were arm's-length transactions. In any event, the district court certainly was not *required* to accept Moose's proposed valuation.

More fundamental, though, Moose's argument depends on internal contradictions. If Moose should be deemed to have returned the property to the investors on the dates he had Infiniti buy the CEP stock, then the relevant value on those dates would be exactly what Infiniti paid for the stock: $200,000. Moose would not be entitled to the increase in the property's value after he supposedly returned it. But if Moose should be deemed to have returned the property to the investors only when he gave up management control of Infiniti in July 2011, then he receives no guideline credit for returning the property because the investors had already discovered the fraud at that time. The law does not need to accommodate this creative argument. Under either branch of these inconsistent positions, the loss amount would be $480,000, not Moose's $70,000 figure.

An even more fundamental and simpler attack on Moose's now-you-see-it, now-you-don't argument focuses on its complete failure to account for the missing $480,000, which is the

central concern of the loss amount here. The government's evidence showed that Moose collected $680,000. He invested $200,000 and embezzled the other $480,000. This should not be a complicated problem. Moose is not entitled to set off the gains on the legitimate investments against the money he embezzled. Many embezzlers intend to pay back the money they have stolen. How often have courts heard explanations like, "I just needed a loan to tide me over, and I was going to pay it all back after …" perhaps a visit to the horse races or the casino? We explained in *United States v. Lauer*, 148 F.3d 766, 768 (7th Cir. 1998): "He is nevertheless an embezzler to the full extent of the amount he took, no matter how golden his intentions or happy the consequences."

We added in *Lauer* that "the amount of the intended loss, for purposes of sentencing, is the amount that the defendant placed at risk by misappropriating money or other property." *Id.* The district court did not err by giving Moose credit for the $200,000 that he actually used to invest in CEP. The court did not have to treat that money as misappropriated. We assume Moose did with that money what he said he would do with it, and the government does not contend that CEP was a Ponzi or pyramid scheme or other complicated financial fraud. Thus, the properly invested $200,000 was at risk of loss due to ordinary investment risk; it was not at risk due to fraud. In this fraud, Moose simply pocketed the rest of the money—the other $480,000. Even if Moose intended that legitimate growth in the value of CEP stock would cover his theft, that intention would not matter any more than another embezzler's intention to pay the stolen money back with the money he hoped to win by gambling with it. The district court did not err in its guideline calculations for Moose.

II. *Reasonable Prison Sentence*

After calculating the guideline recommendations correctly, the district court imposed a prison sentence of 24 months, well below the 41 to 51 month guideline range. On appeal, Moose also argues that the Sentencing Guidelines give unreasonable weight to the loss calculation. This is an odd case for such a challenge, given that Moose received a sentence well below the guideline range, but we are not persuaded in any event.

We review the reasonableness of a sentence for abuse of discretion. See *Gall v. United States*, 552 U.S. 38, 51 (2007). A sentencing court must impose terms that are "sufficient, but not greater than necessary, to comply with" statutory sentencing goals: the need to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "to afford adequate deterrence to criminal conduct;" "to protect the public from further crimes of the defendant;" and "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

Balancing these often-conflicting goals is a difficult task, and one that federal judges widely recognize as their most difficult responsibility. The Sentencing Commission is charged with providing guidance in this area because of its institutional capacity to "base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Kimbrough v. United States*, 552 U.S. 85, 109 (2007), quoting *United States v. Pruitt*, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring). Despite the Commission's expertise, sentencing judges must exercise

their discretion and must recognize that they may vary from the guideline recommendations based on the district court's "superior position to find facts and judge their import under § 3553(a)." *Gall*, 552 U.S. at 51, quotation omitted. In fact, district judges are not permitted to presume the guideline recommendation is reasonable. *Rita v. United States*, 551 U.S. 338, 351 (2007).

Moose asks us to declare his sentence unreasonable on the theory that the guideline enhancements for fraud loss amounts are inherently unreasonable. He claims that the graduated enhancements for rising loss amounts in § 2B1.1 are "not based on empirical data or on national experience." For support, he cites articles finding a lack of evidence that prison has a greater deterrent effect on white-collar crime than does probation. He also notes the escalation of recommended punishments by the Sentencing Commission in the fraud loss table since the guidelines first took effect in 1987. Based on his premise that the loss provisions of the fraud guideline are not based on the Commission's institutional strengths, he cautions that district judges should be extra skeptical of their recommendations in white-collar frauds like his.

Taken purely as theory, divorced from the facts of this case, this argument fails for two reasons. First, Moose focuses on only the deterrent effects of these enhancements. He overlooks the retributive purposes of sentencing. The first factor in § 3553(a)(2) requires a sentencing judge to impose a sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." Even if we accepted Moose's argument that probation

is as effective a deterrent as prison time for people contemplating crimes like his, he has provided no reason to require more lenient sentences for high-dollar, white-collar crimes.

Second, Moose's argument that the loss enhancements are not based on the Commission's institutional expertise is mistaken. Even if the enhancements may lack robust empirical support related to deterrence, they have foundations in empirical data and national experience related to the goals of fair sentencing and retribution. Justice Breyer, who was a member of the original Commission before he joined the Supreme Court, has explained that "to avoid unfair anomalies" among thousands of examined cases, the Commission "increase[d] certain 'white collar' sentences when necessary to avoid disparity between 'white collar' and 'blue collar' crime." Justice Stephen Breyer, *Federal Sentencing Guidelines Revisited*, 11 Fed. Sentencing Reporter 180, 181 (1999). That data might not reflect the deterrent effects of harsher sentences, but it does reflect the Commission's policy judgment that increasing sentences for white-collar crimes would promote greater respect for the rule of law.

Moose has cited scholarly work that has focused on deterrence, but again, deterrence is not the only goal. See Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S (2011); David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995). To the extent Moose's sources address the § 3553(a) sentencing goals of retribution and respect for the rule of law, those sources acknowledge the importance of longer prison terms that respond to public concern for fairness. See Cullen et al., *supra*,

at 59S ("We recognize, of course, that the decision to incarcerate is complex, involving the seriousness of the act, the past record and culpability of the offender, and community values that may wish some crimes to be harshly punished."); Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 475–76 (2007) ("[I]t is important that the restorative component to the public response to white-collar crime does not infringe on important retributive notions such as … punishment of the offenders according to their 'just deserts.'"); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 39 (2006) ("Recent prosecutions and severe punishments in white-collar crime cases offer an example of the system responding to a widespread public perception that it was unjust that corporate malefactors … often received milder punishments than less privileged citizens convicted of much less serious crimes.").

We do not mean to suggest that the loss enhancements of the fraud guideline are beyond debate. Colleagues on other courts have expressed strong reservations about the effects of the guideline in particular cases, and Moose cites *United States v. Algahaim*, 842 F.3d 796 (2d Cir. 2016) ("remand is appropriate to permit the sentencing judge to consider whether the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence"), and *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (finding application of the loss amount guideline combined with other guidelines in securities fraud showed "travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic").

Moose reads these critiques too broadly. Both *Algahaim* and *Adelson* show the mismatch that can occur when broadly applicable guidelines are applied to specific facts. The district judge in *Adelson* concluded that the loss enhancement would work an injustice where the president of a company would have received an effective life sentence for covering up the end of what he "belatedly learned was the substantial fraud perpetrated by others" and served almost as an "accessory after the fact" to the accountants who designed the scheme and the CEO who the government believed, but could not prove, had participated in it. 441 F. Supp. 2d at 513; *id.* at 507, 512**.** *Algahaim* pointed out that the Sentencing Commission took an unusual approach to loss in fraud cases by using a very low base offense level with larger and larger enhancements for larger and larger losses. Without finding that the *Algahaim* defendants were sentenced in error, the Second Circuit remanded so that the district court could consider whether non-guideline sentences would be appropriate, while recognizing that the district court might lawfully impose the same sentences again. 842 F.3d at 800.

Moose's case does not present any comparable arguments for greater leniency. He was apparently the sole perpetrator of his fraud. He did not simply cover up the bad acts of others. He just put in his pocket $480,000 that he obtained under false pretenses. On these facts, we cannot say that the guideline loss enhancements were applied unreasonably here. As we have made clear, district judges are as free to disagree with the policy behind the loss amount enhancement as they are with any other guideline. See *United States v. Corner*, 598 F.3d 411, 415 (7th Cir. 2010) (en banc). But we have also made clear that sentencing judges may choose to follow them and need not address explicitly all arguments questioning the reasonableness

of the Sentencing Guidelines. E.g., *United States v. Rosales*, 813 F.3d 634, 637–38 (7th Cir. 2016).

In a related point, Moose also argues that the court's restitution order to repay $405,945 was clearly erroneous because the district court "simply impos[ed] the entire loss amount as restitution" and did not consider his financial situation and prospects under 18 U.S.C. § 3664(f)(2). This argument has no merit. Section 3664(f)(1)(A) requires courts to "order restitution to each victim in the full amount of each victim's losses," and the district court did that here. See *United States Day*, 418 F.3d 746, 758 (7th Cir. 2005) ("Congress … believed that the law should be concerned first with the victim's right to full restitution … . Therefore, the fact that a defendant may never be able to satisfy a restitution award is no longer grounds for reversing that award."). We also reject the claim that the combination of restitution and prison time renders the sentence unreasonable. Moose committed a serious crime and received a below-guideline sentence. His sentence was not unreasonably severe.

III. *Supervised Release*

Finally, Moose challenges the duration and conditions of his supervised release. We review the district court's imposition of the supervised release term and its conditions for abuse of discretion. *United States v. Shannon*, 851 F.3d 740, 743 (7th Cir. 2017). When district courts impose supervised release terms, they must consider the sentencing factors in 18 U.S.C. §§ 3553(a) and 3583(d) and explain the reasons for imposing supervised release and any discretionary conditions. *United States v. Flournoy*, 842 F.3d 524, 531 (7th Cir. 2016); *United States v. Thompson*, 777 F.3d 368, 377 (7th Cir. 2015). The judge need not provide an individual explanation for a prison

term and a separate explanation for a supervised release term. *United States v. Bloch*, 825 F.3d 862, 870 (7th Cir. 2016). One "overarching explanation" for both prison and supervised release terms may suffice if it provides the defendant with a reasonable explanation for the terms imposed. *Id.*

One overarching explanation often will provide an adequate explanation for the duration of supervised release. Supervised release serves many of the same penal functions as a prison term, so the same rationale for a prison term will often serve equally as well to adequately explain the duration of supervised release. *Id.* at 871. This is particularly so where the sentencing judge imposes a prison term below the guideline range. In those circumstances, the supervised release may be seen as a form of lenity, where the sentencing judge has decided to trade off a portion of the recommended prison sentence for a longer period of supervised release.

Here, the judge provided one justification, and by its terms that rationale applied only to the prison term. The judge said that "if a fair, but substantial sentence[] is not imposed, it would tend to deprecate the seriousness of what you have done. It would not serve as a deterrent to you. And a sentence too light would not serve as a deterrent to others. So it is the judgment of the Court that you serve 24 months, two years, in the Bureau of Prisons." The judge considered mitigating factors and declared again "the judgment of the Court here that 24 months is just enough."

This rationale applies equally well, however, to the determination that the term of supervised release would be "just enough" when combined with the prison sentence. Moose's combined prison term and supervised release term still add up to only about the middle of the recommended guideline

range for prison alone. We do not think that a reasonable defendant would walk away from this sentencing hearing wondering about the reason for the length of the supervised release term. The judge's overarching rationale for the below-guideline prison sentence explained that duration sufficiently.

The judge then pivoted to the conditions of supervised release. Here the judge erred by failing to explain his reasons for imposing a few terms of supervised release to which Moose objected. We have said repeatedly that sentencing judges "need not belabor the obvious" when confronted with an objection where "anyone acquainted with the facts would have known without being told why the judge had not accepted the argument." *United States v. Kappes*, 782 F.3d 828, 856 (7th Cir. 2015), quoting *United States v. Gary*, 613 F.3d 706, 709 (7th Cir. 2010); see also, e.g., *United States v. Sainz*, 827 F.3d 602, 608 (7th Cir. 2016); *United States v. Lyons*, 733 F.3d 777, 785 (7th Cir. 2013). So requiring drug testing for drug offenders or restricting contact with children for offenders who preyed on children does not impose a burden of explanation on sentencing courts. But where the reasons for conditions are less obvious, sentencing judges must address directly objections raised by defendants. Explanations need not be longwinded, but the judge must offer some explanation for appellate review, as deferential as that review may be. See *United States v. Castaldi*, 743 F.3d 589, 595 (7th Cir. 2014).

At sentencing in this case, Moose objected to the restitution order, the drug testing requirement, and the requirement that he permit a probation officer to visit him at work Specifically, Moose's attorney asked that the interest on the restitution amount be waived until Moose left prison; explained that nothing indicated that Moose had ever used illegal drugs; and

expressed concern that a visit from a probation officer in the workplace could adversely affect his future employment. To each of these reasonable but contestable objections, the district judge offered the same reply: "The objection is overruled." The court's terse declarations did not provide the "reasons for its imposition of the particular sentence" required by § 3553(c).

The government contends that the district court's explanation for the prison term provides an "overarching explanation and justification" sufficient to support both the prison term and the supervised release term. *Bloch*, 825 F.3d at 870. For support, the government draws on the district court's conclusory statements during its discussion of supervised release that given "the nature and circumstances of this case, the Court finds that they are appropriately … imposed by the Court" and that the conditions for supervised release were "recommended by the probation officer" and considered "within the context of all of the information before the Court in the report, as well as submissions by defense counsel, and the nature of the allegation to which the defendant has entered his plea of guilty."

In the face of the specific, rational objections by Moose, this conclusory statement was not adequate. It did not address the objections. Concerning restitution, Moose made the reasonable argument that interest on the amount should be waived while he was in prison "because if the interest is growing for two years while he's in prison and can't afford to pay restitution, then what is a difficult amount to pay becomes an impossible amount to pay." The argument may be a bit overblown in drawing the line between difficult and impossible payments, especially since the judgment form is silent on the

matter of interest accrual during his incarceration. Nevertheless, it is clear that accrued interest would create a greater burden on the defendant. This greater burden may well be justified, of course, but the district court needed to explain why it is justified.

Similarly, the court's rejection of Moose's objection to drug testing required some explanation. Moose claims he has no history of drug abuse, and submitting to drug testing periodically would be an undue nuisance if imposed without sound reason. Maybe, maybe not. Drug testing is a mandatory condition of supervised release, but the condition "may be ameliorated or suspended" in certain cases. 18 U.S.C. § 3583(d). To qualify for amelioration or suspension, the defendant must have "a low risk of future substance abuse." § 3563(a)(5). Moose has three convictions for driving under the influence of alcohol, though the last one occurred more than 20 years ago. The presentence report noted that a person close to Moose reported that while he operated the scheme, he "engaged in drinking binges, during which he would become incommunicado with family for one or two days and neglect familial and professional obligations." Even though alcohol abuse may not equal drug abuse, a court would not be unreasonable in denying amelioration or suspension of mandatory drug testing. In doing so, however, the court needed to respond to the objection so that the defendant and a reviewing court can understand its reasons.

Finally, Moose takes issue with the condition permitting the probation officer to visit his workplace. Moose's main objection is that the visitation condition is overly broad and may cause him to lose his job if the officer visits him at work. Again, this concern was fairly stated, though its conclusion is

debatable because we "fairly presume [the defendant]'s probation officer will apply the conditions in a reasonable manner." *Kappes*, 782 F.3d at 857, quoting *United States v. Smith*, 606 F.3d 1270, 1283 (10th Cir. 2010). Nevertheless, we do not believe the lack of explanation is harmless. Moose's concern about his job security after release from prison is a legitimate concern. The district court should have addressed it with more than unexplained rejection.

We repeat what we have said before. Though a judge "need not give a speech about each condition, … sentencing judges rarely, if ever, should list a multitude of conditions without discussion." *Kappes*, 782 F.3d at 846. The needs for these challenged conditions were not so obvious here that explanation was unnecessary in overruling objections. The defendant, through his attorney, expressed reasonable concerns about several of the conditions imposed on him through supervised release. The sentencing judge rejected these arguments without explanation. In doing so, the sentencing judge failed to exercise properly his discretion in imposing a supervised release sentence. Because of this failure, we VACATE the challenged conditions of supervised release and REMAND for the limited purpose of addressing those conditions of supervised release. The 24-month prison sentence and 24-month supervised release terms, however, are AFFIRMED.