In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 17-2132

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

SARAH M. NIXON,

*Defendant-Appellant*.

———————————

Appeal from the United States District Court
for the Central District of Illinois.
No. 15-CR-20057 — **Colin S. Bruce**, *Judge*.

———————————

ARGUED MAY 17, 2018 — DECIDED AUGUST 28, 2018

———————————

Before BAUER, EASTERBROOK, and MANION, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. During contentious child-custody proceedings, Sarah Nixon accused her former husband G.G. of physically and sexually assaulting their daughter S. N.-G. (We respect the parties' convention of using initials to refer to Nixon's ex-spouse, because revealing his name would enable readers to infer the identity of a minor. From now on we refer to the daughter simply as S.) A state

judge in Illinois limited G.G.'s parental rights (visitation required the presence of another adult) while these allegations were being investigated. As the evidence in the custody proceedings wrapped up, Nixon concluded that, at the next scheduled court date, the judge would terminate her parental rights and give G.G. full custody of the child. The evening before the judge's decision was to be announced Nixon left for Canada with S. and remained there even after learning that the judge had given G.G. sole custody. This led to Nixon's conviction for international parental kidnapping. 18 U.S.C. §1204. She has been sentenced to 26 months in prison.

It is an affirmative defense that "the defendant was fleeing an incidence or pattern of domestic violence". 18 U.S.C. §1204(c)(2). Nixon presented evidence that G.G. physically and sexually abused S. The prosecutor sought to demonstrate that Nixon had fabricated this evidence and coached S. to accuse her father of misconduct. On the stand at trial S. professed love for her father and fear of being alone with her mother. She expressed regret at having allowed her mother to persuade her to accuse her father falsely. The jury evidently believed S. The evidence was sufficient to find that Nixon had not carried her burden on this defense.

Nixon submits, however, that the judge made a legal error by limiting her to showing physical (including sexual) misconduct toward her or her daughter. She wanted to argue that both she and S. suffered emotional, psychological, and financial abuse from G.G.—or at least that she reasonably believed that she had suffered these kinds of abuse, even if objectively she had not. She wanted to argue, for example, that G.G. injured her emotionally by selling the house in

which they had resided during their marriage and that G.G. often belittled her.

The problem with this line of defense is the statutory text. It speaks of "domestic violence" rather than abuse more generally—and it requires the defendant to show *real* domestic violence, not just a belief that violence occurred. Selling a beloved house is not "violence"; neither is demeaning language. The Supreme Court has held that proof of "domestic violence" in 18 U.S.C. §921(a)(33)(A) does not require as much physical contact, or as great a risk of physical injury, as other parts of the Criminal Code that use the word "violence." See *United States v. Castleman*, 572 U.S. 157 (2014). We may assume that the phrase "domestic violence" elsewhere in Title 18, including §1204, specifies the same kind of moderate violence. But the Justices have never suggested that the word "violence" in *any* part of the Criminal Code can be satisfied by emotional, psychological, or financial abuse.

Imagine if the tables were turned, and a grand jury indicted a husband for committing "domestic violence", contrary to 18 U.S.C. §2261(a)(1), by failing to provide adequate financial support for his wife or swearing at her in a child's presence. That might be detestable conduct, and could be tortious, but would not be a federal felony exposing the husband to five years in prison. Neither text nor context implies that "violence" has a meaning in §1204(c)(2) different from that in other provisions addressing domestic violence.

Indeed, we could not equate "violence" with "abuse" without converting every child-kidnapping prosecution into a replay of the child-custody proceedings, in which the defendant would try to relitigate the domestic-relations case by showing that he or she really should have received custody.

Yet §1204 is designed to take the outcome of the domestic-relations case as a given. It provides that the loser in a child-custody proceeding must accept the decision (subject to appeal within the state system) and may not spirit the child across an international border. Allowing an "abuse" defense would defeat that function by effectively subjecting the child-custody decision itself to review in the criminal case.

Nixon presents two other legal arguments. First, she maintains that the indictment is duplicitous (that is, charges two crimes in a single count), which led to an erroneous jury instruction. Second, she contends that at the moment she crossed the Canadian border G.G. did not have any parental rights with respect to S. We address these in turn.

Section 1204(a) reads:

Whoever removes a child from the United States, or attempts to do so, or retains a child (who has been in the United States) outside the United States with intent to obstruct the lawful exercise of parental rights shall be fined under this title or imprisoned not more than 3 years, or both.

A one-count indictment charged Nixon with removing S. to Canada and retaining her there with intent to obstruct G.G.'s parental rights. The district judge treated remove and retain as two means of committing a single crime, cf. *Mathis v. United States*, 136 S. Ct. 2243 (2016), and told the jury that it need not agree unanimously on which means Nixon used. That's the right instruction if remove and retain are different means of committing a single crime but not if they are elements of two different crimes. See *Richardson v. United States*, 526 U.S. 813, 817 (1999).

Nixon did not ask the district court before trial to dismiss the indictment as duplicitous. She raised the subject for the

first time during a mid-trial conference devoted to jury instructions. That delay forfeited her current argument. Rule 12(b)(3)(B)(i) of the Federal Rules of Criminal Procedure provides that any defect in the indictment—including "joining two or more offenses in the same count (duplicity)"— that can be raised by pretrial motion must be so raised, and that failure to raise the point before trial forfeits it unless there is "good cause" (Rule 12(c)(3)) for the omission. Nixon has not argued that she had good cause for deferring a duplicity objection until mid-trial.

Rule 12(b)(3) serves multiple important functions. A pretrial decision permits the United States to appeal from an order that, because of the Double Jeopardy Clause, cannot be appealed after trial. It permits the parties to brief the issue with care, rather than address a complex legal issue on the fly during a trial. It prevents game playing. Many a defendant is tempted to seek an acquittal knowing that she has a legal issue in her pocket that will lead to a new trial if the jury convicts. All defendants would love to enjoy a trial that they can win but not lose. Finally, with respect to duplicity in particular, Rule 12(b)(3)(B)(i) calls on defendants to choose their risk: they can insist on a multi-count indictment, and thus require jury unanimity on how the offense was committed, but the price is that they may end up with two convictions, each with its own three-year term of imprisonment. A claim of duplicity can be a double-or-nothing strategy for a defendant.

Rule 12(b)(3) is mandatory but not jurisdictional. Its benefits may be waived or forfeited. See *Hamer v. Neighborhood Housing Services*, 138 S. Ct. 13, 17 (2017). The prosecutor did not invoke Rule 12(b)(3) in the district court or mention it in

the appellate brief. An Assistant United States Attorney requested the benefit of this rule once a judge pointed out the problem at oral argument, but that came too late. Nixon forfeited her legal position, and the United States then forfeited the benefit of Nixon's forfeiture. See *Walker v. Weatherspoon*, No. 17-2665 (7th Cir. Aug. 13, 2018), slip op. 3–4.

As it happens, however, we agree with the district judge's conclusion on the merits: §1204(a) states multiple ways of committing a single crime. Removal, attempted removal, and retaining a child outside the United States are all means of defeating a state court's custody decision. The maximum punishment of three years should not be elevated to nine if a creative prosecutor charges removal, attempted removal, and retention in separate counts. Section 1204(a) is one subsection; it does not have the standard indicators, such as separately enumerated subdivisions, that multiple crimes are being created. We have not found any comparable statute in which specification of related means has been treated as creating separate crimes, and under the approach that *Mathis* took to burglary statutes the list in §1204(a) just identifies three different means.

For what it may be worth, we add that any error was harmless beyond a reasonable doubt. Uncontested evidence shows that Nixon removed S. from the country in anticipation of an adverse decision and kept her in Canada after learning of the adverse decision. Nothing in the evidence at trial would have permitted a rational juror to find removal but not retention, or retention but not removal.

Now for the parental-rights issue. Section 1204(a) penalizes a cross-border abduction in derogation of another person's "parental rights". The phrase is a defined term:

the term "parental rights", with respect to a child, means the right to physical custody of the child—

(A) whether joint or sole (and includes visiting rights); and

(B) whether arising by operation of law, court order, or legally binding agreement of the parties.

18 U.S.C. §1204(b)(2). The district judge told the jury that G.G. had "parental rights" with respect to S. as a matter of law when Nixon removed S. from the United States. Nixon did not ask the district judge to leave this question to the jury but contends in this court that the judge got the answer wrong. (Some passages in her brief also could be read to contend that parental rights must be decided by the jury, but any such argument had to be raised first in the district court, when there was time to put the issue to the jury.)

Nixon maintains that G.G. lacked parental rights when she crossed into Canada because, while investigating Nixon's charge that G.G. had sexually molested S., the state judge forbade G.G. from being in a room with S. unless Dr. Helen Appleton (a child psychologist evaluating the charge of sexual contact) was present. The district judge ruled that G.G. retained "visiting rights" with respect to S., and as "parental rights" include visiting rights there was no room for dispute. And that is correct.

The limitation on visitation was a result of an agreement between the parents. G.G. promised not to see S. unless Dr. Appleton was present; Nixon understood that this would protect S. (if G.G. was indeed a sexual predator) and facilitate Appleton's assessment of how G.G. and S. related to each other. At the time the parents reached this agreement (which was implemented by the state judge), G.G. had visiting rights by order of the state domestic-relations court. The

agreement did not rescind those rights. G.G. had a *right* to see his daughter; that a third party would be present does not make this right something other than "visiting rights". See, e.g., *United States v. Miller*, 626 F.3d 682, 688 (2d Cir. 2010) (a parent's entitlement to supervised visits with a child created "parental rights").

Conditions on the exercise of parental rights do not abrogate them. Take a simple hypothetical: a state court's order provides that X is entitled to custody of daughter Z on weekdays, while Y has custody on weekends. If Y spirited Z out of the country on a weekend, Y could not plausibly argue that this was lawful because X lacked visiting rights on Saturdays and Sundays. The removal would infringe X's rights on the other five days. Similarly, Nixon's removal of S. from the United States infringed G.G.'s right to see S.

Nixon presents a number of additional arguments about the district court's exclusion of some evidence she wanted to introduce. Most of these contentions fail in light of the three legal decisions covered in this opinion. The others need not be discussed separately; the district court did not abuse its discretion.

AFFIRMED