In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-3642

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

WILLIAM D. CORRIGAN,

*Defendant-Appellant*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 CR 915 — **Robert M. Dow, Jr.**, *Judge.*

ARGUED OCTOBER 24, 2018 — DECIDED JANUARY 3, 2019

Before BAUER, MANION, and BRENNAN, *Circuit Judges*.

BAUER, *Circuit Judge.* Following a bench trial, defendant William D. Corrigan ("Corrigan") was found guilty of four counts of wire fraud in violation of 18 U.S.C. § 1343. Corrigan appeals his conviction, arguing that the indictment failed to properly set out a scheme for wire fraud, and the evidence at trial was insufficient to sustain a conviction. Corrigan also

contends that the district court erred when it ordered restitution in the full amount of the investments. We disagree, and for the following reasons, we affirm.

## I. BACKGROUND

Corrigan served as the President and Chief Executive Officer of Embedded Control Systems ("ECS"), a company that developed a process for replacing copper wiring in airplanes with fiber optics. Beginning in 2007, ECS began soliciting capital from various investment groups. Among the investors were Jason Neilitz who purchased $125,000 worth of ECS stock, and Rawah Partners which purchased $350,000 worth of stock.

By June 2008, Corrigan had negotiated a prospective sale of ECS to a third party. However, due to the worldwide financial downturn the sale fell through. Shortly thereafter, through a Board resolution, ECS authorized Corrigan to manage ECS in whatever capacity he saw fit. At the same time, Corrigan was negotiating a sale to another third party when ECS began to suffer from cash flow problems.

ECS had difficulty paying its expenses and its officers' compensation. It closed its bank account with Chase Bank because it was frequently overdrawn, and opened a new account with LaSalle Bank. This account excluded the Vice President of Business Development, A.J. Yarmine, from its signatories. Through 2008, ECS employees received health insurance from the company but ECS fell behind on the payment for the insurance policy in 2008, making the last payment to United Healthcare in November 2008. United Healthcare cancelled the policy in January 2009, due to non-payment.

By March 2009, Corrigan had begun soliciting Jason Neilitz and Rawah Partners for additional investments announcing that ECS was close to closing a sale but needed additional funds to cover ECS's healthcare insurance premiums. On March 22, 2009, and again on April 22, 2009, Corrigan emailed Jason Neilitz stating that the company was close to being dropped by its health insurance provider and that such a result would be "catastrophic" to its employees and the pending sale. Based on Corrigan's representations, Neilitz agreed to purchase an additional $50,000 worth of ECS stock. Per Corrigan's instructions Neilitz wired $50,000 to the specified account which, unbeknownst to Neilitz, was Corrigan's personal account.

At the same time that Corrigan was soliciting additional capital from Neilitz, he was also communicating with Kevin Duncan, a representative from Rawah Partners, to secure an additional investment. After several conversations, in which Corrigan represented that ECS needed an additional capital infusion to cover its health insurance premiums, Duncan agreed to invest. In March 2009, Rawah Partners purchased an additional $50,000 worth of ECS stock. Per Corrigan's instructions, Rawah Partners wired $50,000 to the specified account, which unbeknownst to Rawah Partners, was Corrigan's personal account. In April 2009, Rawah Partners purchased an additional $10,000 worth of ECS stock.

After Corrigan received the funds at the end of March 2009, he began to spend the money on myriad expenses, unrelated to ECS's legitimate expenses. For example, Corrigan: wired money to his girlfriend and her translator; wired money to Flight Test Labs, an associate's company which did not do any

work for ECS; retained an immigration attorney; took vacations; subscribed to dating websites; and covered moving expenses. Corrigan also withdrew $30,000 in cash.

Ultimately, Corrigan was terminated from ECS on July 2, 2011, after ECS's Chief Financial Officer discovered Corrigan had received investor money in his personal account and made no record of the payments. Shortly thereafter, Corrigan contacted Neilitz and Rawah Partners attempting to buy back the fraudulently sold stock. When he was questioned about what had been done with their investments he reaffirmed his original lie, that the funds were used by ECS to pay health insurance costs for employees.

### A. Defendant's Romantic Relationship

In March 2009, at about the advent of Corrigan's scheme, he began courting a Ukrainian woman, Natalia Vasilenko ("Natalia"). Natalia lived in Ukraine and Corrigan spoke with her through a translator, which Corrigan paid for. During their courtship Corrigan spoke about his attempts to raise money for a trip to visit her in Ukraine and that it appeared he would be able to get funds from ECS's investors.

Immediately following the receipt of funds from Neilitz on April 24, 2009, Corrigan booked a flight to Brussels, Belgium, with a return flight and hotel accommodations in Kiev, Ukraine. Also, Corrigan communicated to Natalia that he was speaking with an immigration attorney about bringing her to the United States, and arranged for the transfer of funds to an immigration attorney.

**B. Indictment and Trial**

On November 20, 2013, Corrigan was indicted on four counts of wire fraud, in violation of 18 U.S.C. § 1343. The indictment alleged that Corrigan orchestrated a scheme to defraud ECS's investors by providing them false statements and material misinformation. In December 2013, the government filed an unopposed motion to correct typographical errors in Counts II, III, and IV of the indictment and correctly identify the victim in Count I. The motion was granted without objection.

On December 15, 2015, the case proceeded to a bench trial. At trial the government proved that Corrigan solicited funds from Neilitz and Rawah Partners based on false statements about the status of the company and the need for the funds, and that once he secured the funds, he used them for non-business related expenses and continued to provide the investors with false and misleading information about the usage of the funds.

The district court concluded that Corrigan "engaged in a scheme to defraud Neilitz and Rawah Partners by making false statements and material misrepresentations and by concealing material facts. [Corrigan's] scheme was to obtain additional money from Neilitz and Rawah Partners by falsely representing that the money was needed to pay for and would be used to pay for health insurance premiums for ECS employees." *United States v. Corrigan*, No. 1:13-cr-915, 2016 WL 4945013, at *13 (N.D. Ill. Sept. 15, 2016).

Following trial, the district court denied Corrigan's post-trial motion for acquittal based on the insufficiency of the

evidence. Corrigan was sentenced to a below Guidelines sentence of 144 days (time served) and ordered to pay restitution in the full amount of Neilitz's and Rawah Partners' investments—$110,000.

## II.  ANALYSIS

### A.  The Indictment Properly Set Out a Scheme to Defraud

Corrigan's first argument, that the indictment failed to allege a scheme to defraud, is without merit. In support of this argument Corrigan suggests that the indictment was improperly amended, multiplicitous, and failed to allege fraudulent intent.

Challenges to the sufficiency of the indictment must be raised in a motion to dismiss prior to trial, Federal Rule of Criminal Procedure 12(b)(3)(B), else they are waived, absent good cause. Fed. R. Crim. P. 12(c)(3); *see United States v. Nixon*, 901 F.3d 918, 920–21 (7th Cir. 2018). If a defendant fails to timely contest a constructive amendment, we review for plain error. *United States v. Cusimano*, 148 F.3d 824, 828 (7th Cir. 1998); *see also Puckett v. United States*, 556 U.S. 129, 135 (2009) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."). Under the plain error standard a defendant must demonstrate that:

> "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court

> proceedings; and (4) the error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings."

*United States v. Anderson*, 881 F.3d 568, 572 (7th Cir. 2018) (*quoting United States v. Marcus*, 560 U.S. 258, 262 (2010)).

Here, Corrigan argues that the indictment was improperly amended because the motion to amend was solely to correct a typographical error and the amended indictment instead changed the victim in Count I. He argues this is a significant alteration in violation of the Fifth Amendment, an issue raised for the first time after trial. The district court denied the motion and concluded that the government did not constructively amend the indictment because the Grand Jury transcript, regarding Count I, clearly relates to the fraud perpetrated against Neilitz as did the evidence presented at trial. The district court also reiterated that the amendment to the indictment corrected a misnomer—correctly identifying the victim in Count I. We agree.

Because this challenge was levied for the first time following the trial, we evaluate it under the plain error standard, but Corrigan makes no argument in furtherance of any of the four operative elements. "The purpose of the rule against constructive amendments is to give the defendant reasonable notice so that she can prepare a defense[.]" *United States v. Penaloza*, 648 F.3d 539, 546 (7th Cir. 2011). Here, he has not, and cannot argue that he was unaware of the charges that were brought against him. The grand jury transcript clearly refers to the fraud against Neilitz in Count I and Corrigan was aware of the proper victim during the pre-trial proceedings, undercutting

any suggestion that a substantive right was affected by the scrivener's error in the original indictment. Because Corrigan cannot show that any error occurred, let alone one that affected his substantive rights, we agree with the district court's determination that no constructive amendment occurred.

Next, Corrigan suggests that Counts II through IV are multiplicitous because they stem from Rawah Partners' $50,000 investment and wire fraud requires an additional risk of loss for subsequent claims. He is mistaken.

"A multiplicitous indictment charges a single offense as separate counts … . To determine whether a given indictment contains multiplicitous counts, we look to the applicable criminal statute to see what the allowable 'unit' of prosecution is—the minimum amount of activity for which criminal liability attaches." *United States v. Ajayi*, 808 F.3d 1113, 1123 (7th Cir. 2015) (internal citations and quotations omitted).

> To prove wire fraud the government must show "[defendant's] participation in a scheme to defraud, his intent to defraud, and his use of the wires in furtherance of the fraudulent scheme. Wire communications that lull a victim into a false sense of security *after* the victim's money had already been obtained, or that assist the defendant in avoiding detection may be sufficient to further a scheme."

*United States v. McGowan*, 590 F.3d 446, 457 (7th Cir. 2009) (emphasis added) (internal citations and quotations omitted). As the district court correctly pointed out, Count II was based on Corrigan's March 22, 2009, email to Rawah Partners,

soliciting $50,000 to, allegedly, cover health insurance costs; Count III was based on a November 7, 2011, email, assuring Rawah partners that the funds went to ECS, not Corrigan personally; and Count IV was predicated on a November 9, 2011, email, assuring Rawah Partners that its investment covered health insurance costs in 2009. The Count II email solicited the funds based on false statements and material misrepresentations about the need for and prospective use of the funds. The Counts III and IV emails lulled Rawah Partners into a false sense of security that the funds went to ECS and were used to cover health insurance costs. Because Corrigan cannot show that any of the acts that abet Count II through IV are duplicative, his argument that Counts II through IV are multiplicitous must fail.

Next, Corrigan argues that the indictment failed to allege intent to defraud, stating that "any misunderstanding of how [the invested] funds were to be spent was not <u>material</u> to the decision to invest." Lead Brief and Required Short Appendix for the Defendant-Appellant at 37, *USA v. Corrigan*, 17-3642 (July 5, 2018). We disagree.

This issue is raised for the first time on appeal, accordingly, we review for plain error and liberally in favor of validity. *United States v. Harvey*, 484 F.3d 453, 456 (7th Cir. 2007) ("Generally speaking, 'tardily challenged indictments should be construed liberally in favor of validity.'") (quoting *United States v. Smith*, 230 F.3d 300, 306 n.3 (7th Cir. 2000)). "[F]raud does not require that a defendant contemplate harm to the victim or any loss. In fact, a defendant's honest belief that his actions will ultimately result in a profit and not a loss is legally irrelevant." *United States v. Fard*, 775 F.3d 939, 944 (7th Cir.

2015) (internal citations and quotations omitted); *see United States v. Nayak*, 769 F.3d 978, 980 (7th Cir. 2014) (liability results from the benefit to the defendant, not the harm to the victim); *United States v. Fernandez*, 282 F.3d 500, 507 (7th Cir. 2002) ("[G]overnment [does] not have to prove a contemplated harm to a victim.").

Here, the indictment properly alleges the elements of wire fraud. The indictment alleged Corrigan's "participation in a scheme to defraud, his intent to defraud, and his use of the wires in furtherance of the fraudulent scheme[.]" *McGowan*, 590 F.3d at 457. His argument that the indictment needs to explicitly allege an intent to defraud is based on a misunderstanding of the law. Accordingly, this argument fails.

## B. The Evidence at Trial Amply Supported Corrigan's Conviction

Corrigan next argues that the evidence presented at trial is insufficient to support a conviction for wire fraud. However, ample evidence was presented at trial to prove that he was engaged in a scheme to defraud Neilitz and Rawah Partners and used interstate wire communication to do so.

This Court will only overturn a verdict for insufficiency of the evidence where "after viewing the evidence in the light most favorable to the government, the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Campbell*, 770 F.3d 556, 568 (7th Cir. 2014) (quoting *United States v. Aslan*, 644 F.3d 526, 540 (7th Cir. 2011)). In evaluating a challenge to the sufficiency of the evidence, we do not "weigh the evidence or second-guess the [fact finder's] credibility determinations." *United States v.*

*Coscia*, 866 F.3d 782, 795 (7th Cir. 2017), *reh'g and suggestion for reh'g en banc denied* (Sept. 5, 2017), *cert. denied*, 138 S. Ct. 1989, (2018). Because we "[r]ecogniz[e] that 'it is usually difficult or impossible to provide direct evidence of a defendant's mental state,' we allow for criminal intent to be proven through circumstantial evidence." *Id.* (quoting *United States v. Morris*, 576 F.3d 661, 674 (7th Cir. 2009)).

At trial the government presented ample evidence to prove the three elements of wire fraud: testimony from defrauded investors; Corrigan's email correspondence; evidence of receipt of investor funds; spending records, *et cetera*. All of these showed that Corrigan obtained the funds through fraudulent misrepresentations, used the funds for personal expenses, and concealed his bad acts for years.

At trial, Duncan and Neilitz testified that Corrigan solicited the second round of investments by representing that it was necessary to cover ECS's health insurance costs; that if he was unable to raise the required revenue before the end of March 2009, its health insurer would cancel its policy; and that if Neilitz and Rawah Partners, respectively, were not interested he would have to solicit funds from other investors. These representations were false. By March 2009, United Healthcare had terminated ECS's policy for non-payment and there were no other looming deadlines that required a cash infusion. More to the point, the funds were never used for health insurance costs. Instead the funds were spent by Corrigan personally to, *inter alia*, travel and support his girlfriend.

The government also presented myriad other evidence. Documents showed Corrigan misled investors as to where

the funds would be sent, the Stock Subscription Agreements indicated that the funds would be sent to ECS, but Corrigan provided his personal account number instead. Emails showed that Corrigan repeatedly lied about how the funds had been and were being used—he insisted that the money was used to cover health insurance costs and other ECS expenses. In sum, there was ample evidence to support the district judge's conclusion that Corrigan had perpetrated a scheme to defraud investors. Corrigan told investors he would do one thing but did another.

Corrigan argues, unsuccessfully, that these misrepresentations were not material because he never misrepresented the value of the stock purchased nor did he minimize the risks inherent in the investment. But, "a false statement is material if it has a natural tendency to influence or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *United States v. Seidling*, 737 F.3d 1155, 1160 (7th Cir. 2013) (quoting *Neder v. United States*, 527 U.S. 1, 16 (1999)). A scheme to defraud can exist "even when the scheme was unsuccessful and '*no one* relied on any misrepresentation.'" *Id*. (quoting *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008)).

Here, Corrigan explicitly told the investors that the funds were *necessary* to cover the impending health insurance premiums and that if ECS lost its insurance coverage it would jeopardize the then-pending sale. These statements were meant to induce further investments from Neilitz and Rawah Partners to both protect their initial investments and expedite their return. Accordingly, we agree with the district court; the evidence at trial supports the conclusion that Corrigan made

material misrepresentations about the need for investor funds and what those funds would be used for.

### C. Restitution in the Full Amount of the Fraudulently Solicited Funds is Proper

Corrigan's final argument on appeal is that the district court erred when it ordered $110,000 restitution—the total amount received as a result of the fraud. In support of this proposition he avers that up to half of the funds invested as a result of the fraud were used for ECS purposes; and he should have been credited for the value of ECS's patents. We are not persuaded by either argument.

Typically, the district court's restitution determination is reviewed for abuse of discretion and we will not disturb the restitution order unless the district court relied on impermissible factors or abused its discretion. *United States v. Havens*, 424 F.3d 535, 538 (7th Cir. 2005). However, because Corrigan failed to appropriately raise the issue at sentencing, we review for plain error. *United States v. White*, 883 F.3d 983, 992 (7th Cir. 2018). But, even under the lesser burden, the restitution amount is proper.

Restitution under the Mandatory Victims Restitution Act is *mandatory* when a defendant commits a property crime by fraud. 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii); *United States v. Wilkozek*, 822 F.3d 364, 369 (7th Cir. 2016). "Section 3664(f)(1)(A) requires courts to 'order restitution to each victim in the *full amount* of each victim's losses[.]'" *United States v. Moose*, 893 F.3d 951, 959 (7th Cir. 2018) (quoting 18 U.S.C. § 3663(f)(1)(A)) (emphasis added).

Here we agree with the district court's conclusion that Corrigan is responsible for taking the money out of the hands of investors. According to Neilitz's and Duncan's testimony, neither would have invested additional funds absent Corrigan's representation that the funds were necessary to secure health insurance for ECS's employees.

Moreover, Corrigan effectively conceded the government's loss calculations. Neither at sentencing nor now does he present evidence to support some lesser amount of restitution. Instead he argues that ECS's patents have some intrinsic value that should be credited against the restitution figure, but that is not the test. The district court had to consider "the *full amount* of each victim's losses," *Moose*, 893 F.3d at 959, and it was Corrigan's burden to show that the government's calculation was inaccurate or unreliable and produce evidence as to the actual loss amount. *United States v. Scalzo*, 764 F.3d 739, 745 (7th Cir. 2014). Because the district court neither relied on improper evidence nor did Corrigan present contrary evidence, we find that the district court did not err in ordering restitution in the full amount of the fraud.

### III.  CONCLUSION

The district court found William Corrigan guilty of four counts of wire fraud in violation of 18 U.S.C. § 1343. For the reasons listed above, we find that the district court properly found that Corrigan was guilty of the charged offenses and that the determination of restitution in the amount of $110,000 is proper. Accordingly, we AFFIRM the judgment of the district court.